### Commonwealth v. Frisby

*William J. Davies,* for Commonwealth.

*Ronald J. Klimas,* for defendant.

BLOOM, J., February 4, 1972.—On July 16, 1970, William Nowak died from stab wounds inflicted upon him during the perpetration of a robbery at his grocery store in Chester, Pa., on July 9, 1970. Thereafter, on July 21, 1970, defendant, Ernest Frisby, age 14 at the time, was apprehended by the Chester police on a juvenile petition. On August 20, 1970, a hearing was held in the juvenile court whereby defendant was

certified to the Criminal Division of the Court of Common Pleas of Delaware County for prosecution on the charge of murder. On September 8, 1970, the grand jury returned bills of indictment charging defendant with murder, manslaughter, robbery and burglary. On September 8, 1970, defendant filed a writ of habeas corpus praying for the release of defendant on bail or release of defendant on the grounds of lack of probable cause for his arrest and the alleged failure of the Commonwealth to conduct a proper certification hearing. The habeas corpus proceeding was resolved against defendant by President Judge Diggins on September 11, 1970.

Thereafter, proceedings against defendant as an adult were instituted on September 22, 1970, by the filing of a criminal complaint charging defendant with the felonies set forth above. On September 25, 1970, defendant received a preliminary hearing before District Justice Ernest Burk, who bound defendant over to the grand jury on all charges. On December 22, 1970, the grand jury returned indictments against defendent on all charges, the first set of indictments having been quashed upon motion of the district attorney.

Defendant then filed a motion to suppress the confession of defendant as well as the testimony of two witnesses. On January 15, 1971, the suppression motion was denied after a hearing before Judge Catania. On February 1, 1971, defendant was tried before Judge Bloom and a jury and defendant was found guilty of murder in the first degree, robbery and burglary. The jury imposed a sentence of life imprisonment.

The case is now before this court upon defendant's motion for a new trial and in arrest of judgment. This opinion is written in disposition of those motions.

Aside from the contentions that the verdict was

against the law and against the weight of the evidence, defendant alleges as error the following:

1. The lack of jurisdiction of the court of common pleas to try defendant on the charges of burglary and robbery;

2. The trial judge's charge on the felony-murder rule;

3. The failure of the court to suppress defendant's confession and the testimony of two witnesses;

4. The failure to advise defendant of his constitutional rights;

5. The failure of the trial judge to restrict the district attorney from asking leading questions;

6. The trial judge's refusal to strike the testimony of the Commonwealth's witness, Dr. DiMedio.

Before proceeding to a disposition of defendant's contentions, the facts of the case are set forth as viewed in the light most favorable to the Commonwealth. Commonwealth v. Commander, 436 Pa. 532 (1970).

The Commonwealth's first witness was Catherine Nowak, wife of the victim. She testified that on July 9, 1970, at about 11:30 a.m., she was in a room adjacent to the grocery store which she and the victim operated in Chester, Pa. She heard the bell over the store door ring and someone entered the store. Then she heard the bell ring again and her husband called for her. When she went into the store she found her husband bleeding and he told her he had been stabbed. She ran out of the store and asked someone to call the police and an ambulance. Thereafter, she went into the store and waited. She stated that her husband was then taken to the hospital where he died on July 16, 1970.

The Commonwealth then called Officer Richard Jones, of the Chester police. Jones stated that he answered a call to go to 631 Morton Avenue, Chester,

the site of the Nowak grocery store. When he arrived, he saw the victim standing behind a counter in the store bleeding from the chest and head. He then obtained a statement from the victim who described two colored males having come into the store, one being about five feet, five inches tall and the other about five feet , eight inches. The shorter of the two wore a black tee shirt and dark pants. The short boy had a pocket knife and a note in his hand, the latter of which he gave to the victim to read. The note which was found in the store, read:

"This is a holdup—give up the money and don't ring the bell or I will stab you and he will shoot you."

The victim said he took the note and before he had a chance to read it, the shorter boy leaned over and stabbed him in the chest.

The next witness was Detective Joseph Lastowka, of the Chester police, who testified that his investigation of this case commenced on July 20, 1970. Having obtained the names of several suspects, he went to Chester High School to substantiate the name as far as age and addresses. Also, having the holdup note in his possession, he obtained various documents filled out by all students bearing the names of the suspects and visually compared their writing with the lettering on the note to determine who wrote them. Having probable cause that defendant was the author of the note, Officer Lastowka obtained a juvenile petition against defendant and took him into custody on July 21, 1970, assisted by Captain Laverne Rambo, of the Chester police, Juvenile Division.

The circumstances surrounding the apprehension of defendant were testified to by both Officers Lastowka and Rambo, and their testimony was materially and substantially identical. On July 21, 1970, at about 9:30 a.m., both officers went into the Chester High

School and met the principal, who had defendant brought to the officers. Rambo then took defendant aside and informed him of the contents of the petition and read to defendant the Miranda warnings. Defendant acknowledged that he understood his rights and during the warnings, he stated that he knew why Rambo had come and named Kevin Crews as the assailant. At about 10 a.m., the officers and defendant left the school, got into a police car and drove to police headquarters in Chester. During the five-minute trip from the school to police headquarters, defendant again stated to Captain Rambo that he knew about the murder and that Crews had stabbed the victim, but Rambo stated that no questions were asked of defendant.

Upon arriving at the police station, a phone call was made to defendant's mother, who was not at home. A message was left for Mrs. Frisby to come to the police station, which she did at about 12:30 p.m. that same day. In the meantime, defendant was again advised of his Miranda rights by Detective Lastowka. Once more, defendant acknowledged that he understood his rights, that he knew what the situation was and named another boy, Warren Holloway, as being at the scene of the crime on the day in question. Defendant was then placed in a detention room and Lastowka went out in search of Holloway and Crews. Holloway was found at the Chester High School and Crews was picked up near his house. They were then taken to police headquarters and their parents were advised that they should come down to the station.

After returning from lunch at about 1 p.m. on July 21, 1970, Captain Rambo went back to his office and had the three boys and their parents brought to his office. Again, the Miranda warnings were read and the parents of all three boys were made aware of the

charges brought against each boy. At this point, defendant stated that he had killed the victim. Then, all three boys and their parents were asked if they wanted to make a statement and all indicated their willingness to do so. Defendant and his mother were taken first and after another reading of the Miranda warnings, which defendant and his mother stated they understood, defendant confessed that on July 9, 1970, defendant walked into a building across the street from the grocery store and asked for a piece of paper and wrote the holdup note previously referred to. He told some people in the building what he was going to do. He walked outside and sat on the steps for two minutes when he saw Kevin Crews coming down the street. Defendant asked Crews to go into the store to see who was in there. Crews did so and came back and told defendant that the victim was in there. Then, defendant and Crews went into the store, Crews gave the victim the note and the victim started to laugh and grabbed defendant's nose. Defendant then stabbed the victim in the chest. Defendant further stated that Crews did not know what he was going to do in the store and that he had thought about the holdup all morning on the day in question. He also stated that Mr. Nowak thought the whole thing was a joke but defendant stated that he was not angered by the victim's laughing and his attempt to grab defendant's nose; all defendant wanted was the money. He also exculpated Holloway from any involvement with the holdup. The confession was witnessed and signed by defendant, his mother and six others.

Thereafter, Dr. Donald DeSantis and Dr. Joseph A. DiMedio were called and they established the cause of death of the victim and their medical findings are set forth in great detail in the notes of testimony and

will not be set forth in this opinion. However, a portion of Dr. DiMedio's testimony will be reviewed in response to defendant's contention of error at a later point.

The Commonwealth's next witness was Kathleen H. Lacy, a mathematics teacher in the Chester School District, who stated that defendant was in her homeroom the previous year and was enrolled in her summer school mathematics class. She stated that defendant comprehended clearly all instructions given in her class; was able to read and understand the text books used in her class; was able to deal with complicated problems in mathematics and had earned "A" and "B" grades in her classes.

William St. Germain was called as the next Commonwealth witness, and he testified as follows:

On July 9, 1970, he was parking his truck in front of the Nowak grocery store at about 11:15 a.m. As he was parking, defendant and another boy crossed in front of his truck. He observed defendant going into the store and he came out less than a minute later.

Warren Holloway was then called as a witness and he testified that on July 9, 1970, he accompanied defendant to the Youth Center in Chester where each wrote a note. Holloway stated that defendant wrote the holdup note and they both went out and sat on the steps of the building across the street from the Nowak store. They then met Kevin Crews who was asked to go into the store to see who was there. After Crews came out of the store and stated that only the victim was in the store, Crews and defendant went in. Holloway remained outside but looked in to see what was going on and he observed defendant stab the victim with a knife. Defendant ran out of the store and he and Holloway ran from the scene.

Kevin Crews was also called as a witness and his

testimony corroborated Holloway in every material aspect. At this point, the Commonwealth rested its case. No witnesses were called by defense counsel, and the court inquired of defendant and his mother if they assented to their attorney's advice. They so agreed and after closing argument by respective counsel, the court delivered its charge to the jury. Defense counsel's exceptions to the court's charge will be taken up in detail.

The first error alleged by counsel for defendant is that the Court of Common Pleas of Delaware County, Pa., Criminal Division, had no jurisdiction to try defendant on the charges of burglary and robbery, since, at the time of the acts, July 1970, defendant was not above the age of 14. In support of his position, counsel relies upon 11 PS §260, which provides:

"Whenever any child, *being above the age of* fourteen years, has been held by any magistrate, alderman, or justice of the peace for any offense, other than murder, punishable by imprisonment in a State penitentiary, the judge of the juvenile court having jurisdiction, if, in his opinion, the interest of the state requires a prosecution of such case on an indictment, may certify the same to the district attorney of the county who shall thereupon proceed with the case in the same manner as though the jurisdiction of the juvenile court had never attached."

This court finds no merit to defense counsel's contention. First of all, we cannot agree with defense counsel's contention that the foregoing statute is penal in nature and that it must strictly be construed against the Commonwealth. To the contrary, the statute in question is jurisdictional in character, setting forth the conditions by which a given case may be transferred from a juvenile court to the criminal courts of the various counties. Furthermore, the stat-

ute in question clearly restates the power of the criminal courts to try a juvenile upon proper indictment. This conclusion is supported by 11 PS §256, which sets forth the original jurisdiction of the juvenile court when a person under the age of 16 is charged with a crime, and the power of the juvenile court to transfer a case from its jurisdiction to the courts of quarter sessions and oyer and terminer. See also Commonwealth v. James, 440 Pa. 205 (1970); Commonwealth v. Krynicky, 158 Pa. Superior Ct. 633 (1946). Furthermore, in light of the discretionary power given the juvenile court to certify a case to the criminal courts, it is not consistent to hold that the statute in question is penal in nature. Sections 256 and 260 address themselves to the forum in which a case will be heard and in no way attaches any guilt to the accused, nor is any disposition made of the case which brings it to a conclusion. However, even if the statute in question were penal in nature, in interpreting such a statute, it is not required that words be given their narrowest meaning or that common sense and logic be disregarded: Commonwealth v. Glover, 397 Pa. 543 (1959); Commonwealth v. Butler, 189 Pa. Superior Ct. 399 (1959). Furthermore, words having a precise and well-settled meaning must be interpreted in that sense: Commonwealth v. Hicks, 365 Pa. 153 (1950). In that regard, the word "over" has a plain meaning of "above" or "in excess of." See Evans, A Dictionary of Contemporary Usage, 3rd Ed. (1957) Cf. Merriam-Webster, New Collegiate Dictionary, 7th Ed. (1969). Defendant was born September 22, 1955. He was clearly over 14 on July 9, 1970, the date of the murder. To assert that defendant was not over 14 years of age until he became 15 defies logic and common sense and clearly is a misconstruction of the word "over." A search of the

cases and authorities on this point reveals that no cases in this Commonwealth are squarely on point with regard to this issue. However, two Kentucky cases rejected the contention that a child was to be treated as only 17 years of age until he reached the age of 18: Wilson v. Commonwealth, 271 S.W. 1055 (1925); Thomson v. Commonwealth, 255 S.W. 852. Therefore, we dismiss defendant's contention on this point, especially in light of the procedural safeguards accorded defendant in all the proceedings attending this case as will be discussed hereinafter.

Subsequent to his arrest, defendant was represented by counsel and on August 20, 1970, a certification hearing was held in the juvenile court. After a reading of the charges against defendant, which consisted of robbery and homicide, testimony was presented by the Commonwealth. The coroner established that the victim died as a result of a stab wound of the heart. Detective Joseph Lastowka testified that after defendant and his mother were advised of his constitutional rights, defendant gave a statement that he wrote and used the previously mentioned note and that he stabbed the victim because he wouldn't give defendant any money. After lengthy cross examination by defense counsel concerning the Miranda warnings given defendant and the circumstances surrounding defendant's statement, the judge found a prima facie case of murder and certified the entire case to the Court of Common Pleas, Criminal Division in accordance with the Juvenile Code, 11 PS §§256, 260. A review of the testimony taken at the certification hearing substantiates the juvenile court's findings, and we hold the certification of defendant proper.

On September 8, 1970, after certification to the court of common pleas, the grand jury returned in-

dictments against defendant charging him with murder, voluntary manslaughter, robbery and burglary. However, on September 11, 1970, after a hearing on a writ of habeas corpus, the court directed that defendant be accorded his full rights as an adult defendant. Pursuant to that end, a criminal complaint was filed on September 22, 1970, by Detective Joseph Lastowka, charging defendant with burglary, robbery and murder and a warrant of arrest was issued. After a preliminary hearing before a magistrate, at which time defendant was represented by counsel, defendant was bound over to the grand jury. In December of 1970, the grand jury returned another set of indictments against defendant, charging him with the aforementioned crimes. On January 25, 1971, a suppression hearing was held wherein defendant sought the suppression of the statement he gave the Chester police. Defendant's motion to suppress was refused, and thereafter the case proceeded to trial. The foregoing is set forth to illustrate the painstaking efforts taken to protect defendant's rights both as a juvenile and as an adult, and we find absolutely no prejudice to defendant in the procedure followed in bringing him to trial.

Defendant's next contention is that the trial judge erred in charging the jury on the felony-murder rule, since defendant could not commit robbery and burglary because as a minor, these acts would constitute acts of juvenile delinquency and not crimes. In asserting this second contention, defense counsel loses sight of the fact that the juvenile court certified defendant to the criminal court "as though the jurisdiction of the juvenile court had never attached": 11 PS §260.

Nothing in the Juvenile Code prohibits the court of common pleas to try, upon indictment, a case certi-

fied over to the district attorney, which is subsequently brought to trial before such a court: 11 PS §260. Again, defense counsel argues that the juvenile court had exclusive jurisdiction over the crimes of robbery and burglary, but such is simply not the case under our Juvenile Code. This court knows of no authority which would preclude this defendant from the felony-murder rule. The capacity of this defendant to commit robbery is not raised as an issue. The charge of the court on murder was broad and comprehensive and not restricted to the felony-murder rule, but covered willful, premeditated murder as well as murder in the second degree and manslaughter. Therefore, this contention is dismissed.

Defendant's next contention is that the court erred in failing to suppress the oral and written statements made by defendant, since the statements were made during the illegal detention of defendant and without advising defendant of his constitutional rights. The main thrust of defendant's contention is that there was no probable cause to arrest defendant and that no warrant of arrest had been issued when defendant was picked up by the Chester police at school. In the instant case, a juvenile petition was used instead of a warrant because defendant was known by the arresting officer to be under the age of 18. In any event, a police officer is empowered to make an arrest without a warrant, for a felony, on probable cause known to the arresting officer which may be based on hearsay: Terry v. Ohio, 392 U.S. 1 (1968); Sibron v. New York, 392 U.S. 40 (1968); Draper v. U.S., 358 U.S. 307 (1959).

Probable cause for arrest is made out when there are reasonable grounds to believe that the person arrested has committed a crime. Only the probability and not a prima facie showing of criminal activity is

the standard (Beck v. Ohio, 379 U.S. 89 (1964)), which is less than the standard governing the admissibility of evidence at trial: McCray v. Illinois, 386 U.S. 300 (1967).

A review of the record of the suppression hearing held January 15, 1971, leads this court to conclude that there was probable cause to detain defendant. Detective Lastowka testified that he received information that defendant had told certain people in the Youth Center across the street from the scene of the crime that he was going to hold up the store and that he had written a note to be used in the robbery. Thereafter, the note found in the store was taken by Detective Lastowka and the writing thereon was compared with samples of the writing of defendant and other persons of the same name along with the writing of two other suspects and persons of their same name. The comparison was made with cards filled out by students at the Chester High School. Otherwise, it is undisputed that the police had independent knowledge that a felonious homicide had been committed and that a note had been used in the perpetration of the crime.

It is conceded that the information concerning defendant's activities at the Youth Center, standing alone, may not have been sufficient probable cause to arrest defendant in accordance with the standard set forth in Draper, supra. However, the police did not rely blindly on the hearsay information received, but rather pursued an independent course of investigation which corroborated and supported the probability that defendant was involved in a murder. Whether or not the police officer's opinion as to the handwriting would be sufficient for trial purposes is not the test for probable cause. Rather, was it probable that defendant's handwriting from the school cards suffi-

ciently matched the writing on the note is the standard to be applied. The judge presiding at the suppression held that probable cause had been established and corroborated and refused defendant's motion to suppress, and this court is not disturbed by that decision.

Defense counsel also urges as error the failure of the Commonwealth to reveal the identity of the informant who notified the police of defendant's activities in the Youth Center. In support of his contention, defendant cites the case of Roviaro v. U. S., 353 U. S. 53 (1957). While it is true that Roviaro establishes certain standards by which an informant's identity must be revealed in Federal cases where the informant's information is used at the trial of defendant, McCray v. Illinois, 386 U. S. 300 (1967), expressly held that Roviaro was not applicable to State prosecutions. Furthermore, the information received from the informant in the instant case was not used or presented at defendant's trial.

Defense counsel contends that the testimony of Kevin Crews and Warren Holloway should not have been admitted at the time of trial since defendant divulged their names during the time defendant was illegally detained. Suffice it to say that defendant was not illegally arrested and furthermore, the identity of Crews and Holloway had been obtained by the police from sources other than defendant and that, in fact, Crews and Holloway were suspects in this case and their names and handwriting samples were used by the police prior to defendant's arrest.

Defendant's next contention is that defendant had not been advised of his constitutional rights and that his confession was not voluntarily made. These questions were raised by defense counsel at the certification hearing, the preliminary hearing and the sup-

pression hearing. In addition, the Trial Judge gave a detailed, lengthy and correct charge to the jury respecting the voluntariness of defendant's confession, wherein the jury was instructed to determine whether or not defendant's confession was made intelligently and voluntarily beyond a reasonable doubt. On January 12, 1972, the United States Supreme Court in the case of Lego v. Twomey, 40 U. S. Law Week 4135, held that confessions may now be admitted into evidence at the time of trial following a determination that by a *preponderance of the evidence,* it is proven that the confession was freely and knowingly made. Therefore, the jury in the instant case was bound by an even higher standard of proof than may be required in the future with respect to confessions and there is substantial evidence in this case to support the jury's finding that the confession was voluntarily and knowingly made by defendant. The jury had the benefit of hearing all the facts and circumstances attending defendant's arrest and confession as set forth in the facts of the case. At no stage of this prosecution is there anything to suggest that defendant was not advised of his constitutional rights, that he didn't understand his rights or that he was coerced into making a confession.

The mere fact that defendant was a juvenile does not, of itself, make it impossible for him to have voluntarily confessed. See Commonwealth v. Green, 396 Pa. 137 (1959); Commonwealth v. Turner, 371 Pa. 417 (1952); Lopez v. U. S., 399 F.2d 865 (1968). Of course, age and mental capacity can affect understanding and volition, but that is a question of fact which was resolved against defendant. This conclusion is substantially supported by the record.

Defendant next alleges that defendant was deprived of a fair trial by reason of the deliberate

conduct of the district attorney with respect to the asking of leading questions. A review of the examples cited by defense counsel, when read in context, leads this court to conclude that some of the questions cited were not leading and those that were leading were harmless and are not fundamentally fatal to the trial.

Finally, defense counsel alleges that the court erred in refusing defense counsel's motion to strike the testimony of Dr. Joseph A. DiMedio. Defendant's specific objection is that the doctor's opinion as to the cause of death of the victim was based, in part, upon history or statements given to the doctor by persons outside of the courtroom and not under oath.

In arriving at an opinion as to the cause of death, Doctor DiMedio testified that he considered the history given to another physician and the statements made by the other physician that the victim had suffered a stab wound. The doctor stated that prior to conducting an autopsy, it was his usual and necessary practice to obtain as much information as possible concerning the victim's death. However, after he examined the victim, Doctor DiMedio stated that his own findings substantiated the information he had received.

In the very recent case of Commonwealth v. Thomas, 444 Pa. 436 (1971), our Supreme Court was presented with this very issue. In holding admissible medical testimony and opinion based, in part, upon reports of others not in evidence, but upon which the medical expert customarily relies in his practice, the court stated:

" '. . . where the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately,

there seems to be every reason for admitting testimony based in part on this. . . .'

"It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania."

The holding in Thomas is so clearly applicable to the instant case that we dismiss defense counsel's contention on this point without further comment.

Therefore, we enter the following,

### ORDER

And now, February 4, 1972, upon consideration of briefs submitted and after argument before the court en banc, it is hereby ordered and decreed that:

1. Defendant's motion for a new trial is dismissed;

2. Defendant's motion in arrest of judgment is denied;

3. Defendant shall appear for sentencing on Friday, February 18, 1972, at 10 a.m., in Courtroom No. 2, Courthouse, Media, Pa.