STATE of Maine

v.

NICHOLAS S.

Supreme Judicial Court of Maine.

Argued Nov. 18, 1982.

Decided April 23, 1982.

Janet T. Mills, Dist. Atty., Geoffrey Rushlau (orally) Asst. Dist. Atty., Auburn, for plaintiff.

Gauvreau & Thibeault, N. Paul Gauvreau (orally), Lewiston, for defendant.

Before McKUSICK, C. J., and NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

CARTER, Justice.

Following a joint juvenile adjudicatory hearing, the District Court, sitting as the Juvenile Court, found that the juvenile defendant, Nicholas S., had committed the juvenile offenses of theft and burglary. His brother, also a juvenile, was adjudicated to have committed the lesser offense of criminal trespass.

The appeal by Nicholas S. to the Superior Court, Androscoggin County, was denied.[1] On appeal to the Law Court, the juvenile asserts that the District Court erred in admitting into evidence his confession to the above noted offenses. Specifically, he argues that his statements were inadmissible because they were not a product of a knowing, intelligent and voluntary waiver of his *Miranda* rights. We vacate the judgment below and remand for further proceedings.

1. The juvenile's brother did not appeal.

## Factual Background

On February 14, 1981, two Lewiston police officers, Lieutenant Maurice Bolduc and Detective Charles Frazer, went to the Hillview Apartments to investigate a burglary. Earlier that afternoon, the victim of the burglary had discovered that approximately $8,000 in cash was missing from a strongbox stored in his apartment. After examining the victim's apartment and attic, the officers surmised that entry into the victim's attic had been gained by removing a piece of firewall separating the victim's attic from the attic of the adjoining apartment. Entrance into the living area of the victim's apartment was by way of the trap door leading from the attic to the living area.

The police then approached the occupant of the adjoining apartment, Mrs. S., the juvenile's mother, and explained to her that they were investigating a burglary. They asked her permission to search her attic and the mother consented. Upon searching the attic, the officers discovered several rolls of money on the floor of the attic. They then requested that Mrs. S. and Nicholas S., the only one of her three sons that was present in the apartment at the time, accompany the officers to the police station.

At the police station, Mrs. S. permitted the police to fingerprint her son. The juvenile was uncooperative at the fingerprinting session. He testified that he thought he had to give his fingerprints to the police. Soon thereafter but before the questioning began, the juvenile overheard the police say that one of his fingerprints matched a print found in the victim's apartment. At this point in time, the *Miranda* warnings had yet to be given to either the juvenile or his mother.

About a half-hour after arriving at the station, the mother and her son were seated in an office. Bolduc and Frazer joined them to conduct the interrogation. Frazer read the *Miranda* warnings from a card and Bolduc elaborated on Frazer's reading. The testimony of record does not suggest the

extent of this explanation of the rights. The officer's differ in their recollection as to whether the juvenile was informed that he had a right to request at any time that the questioning cease.

The testimony of the officers also differs as to whether, in reading the *Miranda* rights, the focus of the police was towards the mother rather than the juvenile. Frazer indicated that he was reading to Mrs. S.; Bolduc concurred in this respect but further intimated that he addressed both the mother and the juvenile. The juvenile testified that the officers read to his mother and told him that "it wasn't necessary for me to know 'em." The Juvenile Court found that the *Miranda* rights "had been explained *to his mother*, in the juvenile's presence." (Emphasis added.)

Following the reading of the rights, Mrs. S. stated that she understood them. The Juvenile Court specifically found that Nicholas S. "made no formal agreement or statement that he understood and . . . would waive his *Miranda* rights." Mrs. S. told her son to tell the truth and the police then asked what they described as "a leading question" regarding the burglary. The juvenile replied, "You already know", a response based upon his having overheard the statement regarding the fingerprint match-up. Nicholas S. then proceeded to answer questions about the burglary. The "confession" was not in the form of a narrative; when asked questions, the juvenile responded.

The first period of interrogation lasted 30 to 45 minutes. By the end of this session, the juvenile had told the police where he had hid some of the money. The parties then went to the apartment, recovered the money and returned to the police station. Upon their return, the juvenile was questioned for two more hours.

Following a suppression hearing held on March 12, 1981, the Juvenile Court found that although the juvenile made no express waiver, it appeared that he understood his rights. The court also found that the rights had been explained to his mother, in the juvenile's presence. The court denied the motion to suppress.

The juvenile again raised the issue of the propriety of the confession at the adjudicatory hearing held on March 12 and 16. The Juvenile Court denied this motion on the basis of its decision at the suppression hearing. The Juvenile Court adjudicated the defendant to have committed the juvenile offenses of theft and burglary.

From the adjudication by the Juvenile Court, the juvenile appealed to the Superior Court. The Superior Court found that there was rational support for the conclusion that *Miranda* warnings were given and understood, that the confession was voluntarily given and that the juvenile knowingly, intelligently and voluntarily waived his rights. Accordingly, the Superior Court affirmed the judgment below. This appeal followed.

### The Admissibility of the Confession

In *State v. Ann Marie C.*, Me., 407 A.2d 715 (1979), this Court adopted the totality of the circumstances test to determine whether a juvenile has knowingly and voluntarily decided to forego his right to remain silent and to have the assistance of counsel. Quoting from the United States Supreme Court decision in *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), we noted:

This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult had done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he had the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*State v. Ann Marie C.*, 407 A.2d at 724, quoting *Fare v. Michael C.*, 442 U.S. at 725, 99 S.Ct. at 2572, 61 L.Ed.2d at 212. *See State v. Michael L.*, Me., 441 A.2d 684, 688 (1982).

In articulating this standard, the majority in *Fare v. Michael C.* expressed the belief that juvenile courts are capable of applying the totality of the circumstances analysis so as to take into account the special concerns that are present when juveniles are in custody. *Fare v. Michael C.*, 442 U.S. at 725, 99 S.Ct. at 2572, 61 L.Ed.2d at 212–13. This view, however, has been questioned by commentators and rejected by various jurisdictions in favor of some form of a *per se* exclusionary rule whenever certain initial safeguards such as the presence of a parent have not been met. *See e.g.*, Conn.Gen. Stat.Ann. § 46b–137(a) (West Supp.1981); Okla.Stat.Ann. tit. 10 § 1109(a) (West Supp. 1979–1980); *State ex rel. J. M. v. Taylor*, 276 S.E.2d 199 (W.Va.1981); *In re Dino*, 359 So.2d 586 (La.1978), *cert. denied* 439 U.S. 1047, 99 S.Ct. 1022, 58 L.Ed.2d 706; *Commonwealth v. Smith*, 472 Pa. 492, 372 A.2d 797 (1977); *Grisso, Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 Cal.L.Rev. 1134 (1980); Levy and Skacevic, *What Standard Should Be Used To Determine A Valid Juvenile Waiver?*, 6 Pepperdine L.Rev. 767 (1979); Comment, *The Judicial Response to Juvenile Confessions: An Examination of the Per Se Rule*, 17 Duquesne L.Rev. 659 (1978–1979).

■ The parties in this action do not question the vitality of the totality of the circumstances approach in this jurisdiction.

We note, however, the superiority of this approach over a *per se* rule when the traditional test is properly applied. The framework provided by the totality of the circumstances test is sufficiently flexible so as to accommodate the interests of both the juvenile and the State. Liberal application of the rule in favor of juvenile rights, however, is absolutely essential. Objective satisfaction by the State of several of the relevant factors articulated in case law can not substitute for a critical examination of the circumstances surrounding the confession and a sensitive understanding of a juvenile's vulnerability in a custodial atmosphere. The simple balancing of factors can only lead to a cursory appraisal of the juvenile's position thereby threatening the protection of his fundamental constitutional rights.

■ Under the totality of the circumstances approach, no single factor is controlling in determining whether a juvenile has validly waived his rights. The factors noted in *Fare v. Michael C.*, and *State v. Ann Marie C.*, are by no means exclusive.[2] The manner in which these factors are to be weighed and evaluated is a matter typically left to the exercise of the sound judgment of the trial judge. Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 Cal.L.Rev. 1134, 1138 (1980). In appraising these factors, however, courts must never lose sight of the fact that a juvenile's vulnerability and immaturity places him at a greater disadvantage than an adult when dealing with the police. As noted by Justice Fortas in the landmark decision of *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967):

**2.** The Fifth Circuit in *West v. United States*, 399 F.2d 467 (5th Cir. 1968), *cert. denied* 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969) articulated a number of factors, in addition to those noted in *Ann Marie C.*, to consider in determining whether a juvenile has voluntarily and intelligently waived his rights. These are:

1) age of the accused; 2) education of the accused; 3) knowledge of the accused as to both the substance of the charge, if any has been filed, and the nature of his rights to consult with an attorney and remain silent; 4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; 5) whether the accused was interrogated before or after formal charges had been filed; 6) method used in interrogation; 7) length of interrogations; 8) whether vel non the accused refused to voluntarily give statements on prior occasions; and 9) whether the accused has repudiated an extra judicial statement at a later date. *West v. United States*, 399 F.2d at 469. Other factors include the juvenile's mental age, physical condition and previous police or court experience. *See State ex rel. J. M. v. Taylor*, 276 S.E.2d at 202; *Commonwealth v. Cain*, 361 Mass. 224, 228, 279 N.E.2d 706, 709 (1972).

[T]he greatest care must be taken to assure that the admission was voluntary, in the sense that it was not coerced or suggested but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or dispair.

387 U.S. at 55, 87 S.Ct. at 1458, 18 L.Ed.2d at 561; *see Fare v. Michael C.*, 442 U.S. at 729, 99 S.Ct. at 2573, 61 L.Ed.2d at 215 (dissenting opinion by Marshall, J.) *citing Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325, 329 (1962) (juvenile cannot be compared with an adult in full possession of his senses and knowledgeable of consequences of his admission) *and Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224, 228 (1948) (child is easy victim of law; cannot be judged by more exacting standards of maturity).

In the instant case, the State notes several factors which it asserts supports the District Court's finding of a knowing and voluntary waiver by the juvenile. These are: (1) the reading and explanation of the *Miranda* warnings, (2) the defendant's statement that they already had him, (3) the juvenile's willingness to answer questions, (4) the defendant's assistance in retrieving the stolen money, (5) the presence of the mother during the interrogation, (6) the conversational tone of the questioning and (7) the defendant's "cute" behavior during the fingerprinting and the interrogation sessions. In essence, the State focuses on the objective indicia during the interrogation to support its position.

■ Such a focus is not inappropriate; it is, in most instances, however, inadequate. The totality-of-the-circumstances approach requires a broader evaluation of the circumstances surrounding a confession than examination of only the words spoken and actions taken by the parties during the actual period of questioning. The analysis *must* include "evaluation . . . into whether the [juvenile] had *the capacity to understand the warnings given to him*, the nature of his Fifth Amendment rights, and *the consequences of waiving those rights.*" (Emphasis added.) *State v. Ann Marie C.*, 407 A.2d at 724. Moreover, we find that the factors suggested by the State are insufficient, given the other circumstances of this case, to establish a valid waiver by the juvenile.

■ The State suggests that the police officers read and elaborated upon the *Miranda* warnings. The officers did not explain at the suppression hearing, however, the extent of their elaboration beyond the conclusory statement that they did indeed elaborate upon the standard *Miranda* reading. Moreover, Lieutenant Bolduc indicated that he did not believe the juvenile was informed that he could terminate the questioning at any time. There may be no express requirement that the police, prior to the commencement of interrogation, give the "fifth" *Miranda* warning, that is, inform the accused of his right to terminate questioning at any time. *See Commonwealth v. Lewis*, 374 Mass. 203, 205, 371 N.E.2d 775, 777 (1978) (better practice is to give fifth *Miranda* warning); *Micale v. State*, 76 Wis.2d 370, 251 N.W.2d 458 (1977) (fifth warning required). The failure to give this warning, however, will generally raise a serious question as to the adequacy of a juvenile's understanding of his rights and, in this case, specifically raises serious doubt as to the claimed elaboration of the *Miranda* rights. *Cf. United States v. DiGiacoma*, 579 F.2d 1211, 1214–15 (10th Cir. 1978). Law enforcement officials would be well advised to fully explain the rights enunciated in the *Miranda* warning when dealing with juvenile offenders in order to assure adequate comprehension of these important safeguards.[3]

---

3. Of lesser significance but still relevant is the police officer's failure to repeat the *Miranda* warning when the interrogation process was resumed following an interruption. In the instant case, the *Miranda* warning was given prior to the first period of interrogation which lasted 30–45 minutes. The officers, the juvenile and his mother then returned to the apartment to recover some of the money. They then came back to the police station for two more hours of questioning. No *Miranda* warnings were given at the apartment or upon recommencement of the interrogation process.

■ Both Bolduc and Frazer also indicated, and the District Court found, that in the course of their explanation of the *Miranda* rights, they focused their remarks towards the juvenile's mother. It is certainly a sound policy to have a parent or another interested adult present during the questioning of a juvenile. *See State v. Michael L.,* 441 A.2d at 688. We applaud the actions of the police in this respect. The police must not forget, however, that the juvenile must also be apprised of *his* rights. *See Matter of Hector G.,* 89 Misc.2d 1081, 1084, 393 N.Y.S.2d 519, 522 (1977). It may not be assumed that an unfocused explanation or remarks directed *toward an adult* is adequate to convey to a fourteen-year-old juvenile a sufficient understanding of his rights to support a finding of a waiver of them. Moreover, the presence of an interested adult during the questioning is a less weighty indicium of a valid waiver when the child is not afforded the opportunity to meaningfully and privately consult with that adult. *See In Re Dino,* 359 So.2d at 594 (*per se* rule); *Commonwealth v. Roane,* 459 Pa. 389, 396, 329 A.2d 286, 289 (1974), or when the adult's mental or intellectual capabilities, as here, raise doubts as to the adult's understanding of the constitutional rights at issue. *See State v. Michael L.,* 441 A.2d at 690 (Carter, J., dissenting).

■ The other factors noted by the State are inapposite inasmuch that the juvenile's overall cooperativeness during his custody does not indicate an understanding or voluntary waiver of his rights. He may well have felt *obliged* to act in a cooperative manner. Indeed, Nicholas S. testified that he thought he had to answer the officer's questions and that both his mother and the police told him to tell the truth. The accused need not be physically abused or expressly threatened in order for a confession to be made without a full understanding or waiver of one's rights.

■ Telling on the issue of waiver is the limited education and experience of the juvenile. The juvenile is fourteen-years-old, in the eighth grade at school and has limited, almost nugatory, prior experience with the criminal justice process. The juvenile testified that he missed a lot of school, flunked English and predominantly read comic books. Frazer was aware of the juvenile's age and grade and Bolduc knew the defendant missed a lot of school. These factors are, in the context of this case, suggestive of an inability on the part of the juvenile to fully understand the *Miranda* warnings and the consequences of waiving these rights. While not necessarily dispositive, a juvenile's age, intelligence, level of education and experience with the criminal justice system are important considerations in evaluating the validity of a juvenile's waiver.[4] *See Clewis v. Texas,* 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423, 428 (1967) (other factors take on greater significance in light of fifth grade education of juvenile and fact that he had never been in trouble with the law before); *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325, 328 (1962) (fourteen-year-old is unlikely to be capable of knowing how to protect his own interests); *Commonwealth v. Cain,* 361 Mass. 224, 228–29,

---

The time lapse between the giving of the *Miranda* warnings and the making of statements by the accused, the interruption of the interrogation process, and change in locations are factors bearing on the carryover effect of a *Miranda* warning. *State v. Ruybal,* Me., 398 A.2d 407, 412 (1979). While these factors in this instance do not render the *Miranda* warning ineffective, they are relevant indicia bearing on the adequacy of the police's sensitivity to the special needs of a juvenile in a custodial setting.

4. The Supreme Court in a variety of contexts has expressed special concern for the vulnerability of children. Most recently in *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), a case involving a child's right to abortion without parental consent, the Court noted that: "immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences." 443 U.S. at 640, 99 S.Ct. at 3046, 61 L.Ed.2d at 811. This observation is telling in the instant case inasmuch as it reaffirms the importance of ascertaining whether a juvenile is capable of comprehending the meaning of the rights articulated in the *Miranda* warning and the consequences of their waiver.

279 N.E.2d 706, 709–10 (1972) (age is not controlling but a relevant factor together with prior experience with police practices, lack of parental guidance, agitated state of juvenile); *State v. Prater*, 77 Wash.2d 526, ——, 463 P.2d 640, 641 (1970) (juvenile because of fifteen prior arrests was well advised of constitutional rights); *see generally* Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 Cal.L.Rev. 1134, 1138 n.24 (1980).

■ The factors noted above raise grave doubts as to whether there was a real understanding and intelligent exercise by the juvenile of his rights. The limited explanation of the rights to the mother of the juvenile, a young boy of limited experience, is insufficient for us to find that Nicholas S. was aware of his rights and the consequences of foregoing them.[5] Upon review of the Juvenile Court's decision, *see State v. Joey F.*, Me., 438 A.2d 1273, 1274 (1982), we conclude that the record does not provide rational support for the court's denial of the suppression motion. *See State v. Bleyl*, Me., 435 A.2d 1349, 1358 (1981); *State v. Theriault*, Me., 425 A.2d 986, 989 (1981).[6]

The entry is:

Judgment of the Superior Court vacated.

Remanded to the Superior Court for entry of an order vacating the judgment of the District Court and remanding the case to the District Court for further proceedings consistent with the opinion herein.

NICHOLS, ROBERTS, and VIOLETTE, JJ., concurring.

WATHEN, Justice, with whom McKUSICK, Chief Justice, joins, dissenting.

I am unable to agree with the conclusion of the majority. The trial court's denial of the suppression motion is rationally supported by the record and therefore I must dissent. The applicable law is well documented and may be simply stated. The determination of the waiver of *Miranda* rights by a juvenile involves an application of the totality-of-the-circumstances test. *State v. Michael L.*, Me., 441 A.2d 684 (1982); *State v. Ann Marie C.*, Me., 407 A.2d 715 (1979). The admissibility of a confession and the associated factual findings are reserved to and decided by the judge presiding at the suppression hearing. *State v. Theriault*, Me., 425 A.2d 986 (1981).

**5.** We distinguish *State v. Michael L.*, Me., 441 A.2d 684 (1982). In that case, the juvenile was fifteen-years-old, read his rights from a *Miranda* card, and expressly stated he understood those rights. The opinion does not suggest any personal characteristics of the juvenile telling on his inability to understand his rights or the consequences of foregoing them. The main claim of error in *Michael L.* was that the police used the juvenile's father "to cause a confession from the child" by having him present during the interrogation of the child without informing the parent of his son's rights. The son admitted the commission of the incident under investigation after the father asked about his involvement.

The instant case presents almost the converse of the factual situation noted above. Here, as the Juvenile Court found, the *Miranda* warnings were given only to the parent but in the juvenile's presence, and the juvenile made no express statement as to an understanding or waiver of those rights. The juvenile rather than readily admitting his participation in the burglary only made statements in response to the police officer's questions during the three-hour period of interrogation. Moreover, several factors in this case raise doubts as to the

juvenile's, as well as the mother's, ability to comprehend the meaning of the *Miranda* rights and the consequences of a waiver of those rights.

By the very nature of the totality of the circumstances approach, a case by case analysis is required. Our discussion in this case should not be interpreted as retreating in any way from our holding in *Michael L.* We note the differences between that case and the instant matter as indicative of the weighing and assessment of circumstances required by the totality approach in order to assure the exercise of that special caution necessary in determining the validity of a juvenile's waiver.

**6.** The juvenile's brother was adjudicated to have committed the offense of criminal trespass. In the joint hearing, the Juvenile Court excluded the use of the confession of Nicholas S. as evidence against his brother. Besides the confession, the evidence against both juveniles was substantially the same. In light of our finding that the confession should have been suppressed and the disparity between the adjudication of Nicholas S. and his brother, we can only conclude that the error was prejudicial.

The conclusion of the trial judge, if he is convinced beyond a reasonable doubt, will be sustained on appeal unless the record provides no rational support. *State v. Bleyl*, Me., 435 A.2d 1349 (1981); *State v. Theriault*, Me., 425 A.2d at 987–88; *State v. Collins*, Me., 297 A.2d 620, 625 (1972).

In denying the suppression motion, the trial court ruled that the juvenile waived his rights with knowledge and intelligence and did so voluntarily. The court found expressly that the juvenile "showed on the stand that he knew what the [*Miranda*] rights were, and it seemed to be that he understood them." In the face of this express finding of fact, the majority determines that the record does not rationally support the conclusion that the juvenile was aware of his rights and the consequences of foregoing them.

The most compelling record evidence supporting the trial judge's ruling is the testimony of the juvenile himself. Each time he was asked about his understanding he presented a variegated response but never specifically claimed that he did not understand.

Q. Did you know that you had a right to ask them to stop asking you questions?

A. Yeah, well, I stalled—I went like that, and they said "Well, what happened?" they asked me some more questions.

\* \* \* \* \* \*

Q. Did you know you had a right to say, "Well, hold on, I'm not going to answer".

A. Well, I forgot, well, I was scared—I—I thought I had to. See, like the fingerprints,—or I thought I had to.

\* \* \* \* \* \*

Q. Did you know that you had the right, at any time, to request the police officers to stop asking you questions?

A. Well, I didn't know, because they—I thought they really had me—really got me, you know, so I would have to tell—I thought they—I'd have to tell.

*Because they got my fingerprints.* (emphasis added)

Having heard this evidence and witnessed the demeanor and manner of the juvenile, the trial judge was called upon to decide whether: (1) the juvenile had no understanding of his rights, (2) he initially understood but then forgot, or (3) he understood but voluntarily chose to talk, possibly because he knew that the police had obtained his fingerprint from the premises. The cold record suggests strongly that the latter situation prevailed. It would have been permissible for the trial court to conclude that understanding did exist and that the juvenile chose to talk because of the strength of the evidence and perhaps because he vainly hoped to shield his brother who was also implicated.

The accuracy of the foregoing speculation need not be established. It only serves to demonstrate that this record is not devoid of rational support for the conclusion reached by the trial judge. In a case such as this, in which the defendant does not unequivocally deny his understanding of the *Miranda* rights, the factual determination of his understanding is wisely left to the trial judge. He alone is in a position to believe or disbelieve the testimony of the defendant. He alone has "the prerogative selectively to accept or reject" testimony presented "in terms of the credibility of the witnesses or the internal cogency of the content." *In Re Fleming*, Me., 431 A.2d 616, 618 (1981). The trial judge's conclusion in this case that the juvenile understood his rights finds rational support in the record, even if only the testimony of the juvenile is considered.

I would affirm the judgment.